O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 88-732 RSWL |
| Plaintiff, | ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW RE JURISDICTION BASED ON FUGITIVE TOLLING** |
| v. | ) | |
| GERALD MARK WILLIAMS | ) | |
| Defendant. | ) | |

On May 10, 2011, the Court revoked Defendant Gerald Mark Williams's ("Defendant") term of supervised release and sentenced him to the custody of the Bureau of Prisons for a term of thirty-three months in prison to be followed by sixty-three months of supervised release. Though Defendant's supervised release was originally scheduled to expire on June 17, 2005, the Court held that a December 22, 2003 bench warrant stayed Defendant's term of supervised release pursuant to 18 U.S.C. § 3583(i) and gave the Court jurisdiction to revoke Defendant's supervised release and sentence him to an additional prison term on May 10, 2011.

1

On January 13, 2012, the Ninth Circuit reversed the Court's decision and held that § 3583(i) did not extend the Court's jurisdiction beyond the original June 17, 2005 expiration date. The Ninth Circuit, however, stated that Defendant's supervised release could have been tolled if he was found to be a fugitive. <u>United States v. Gerald Mark Williams</u>, No. 11-50210, 2012 WL 235636 (9th Cir. Jan. 26, 2012). Because the issue of fugitive tolling had not been developed by the Court during the May 10, 2011 revocation hearing, the Ninth Circuit remanded the case back to this Court for "evidentiary development and consideration of the issue of fugitive tolling." <u>Id.</u>

On June 5, 2012, the Court presided over an evidentiary hearing regarding the issue of fugitive tolling. After consideration of the pleadings and evidence submitted by the Parties and the arguments presented at the June 5, 2012 hearing, the Court **HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

## I. FINDINGS OF FACT

1. In the underlying criminal case brought by the Government against Defendant, Defendant faced a two-count indictment charging him with distributing cocaine and crack cocaine in violation of 21 U.S.C. § 841(a)(1).

2. On January 25, 1989, following a jury trial in the Central District Court before the Honorable A.

Wallace Tashima, Defendant was found guilty on both counts.  A sentencing enhancement alleging a prior conviction within the meaning of 21 U.S.C. §§ 841 and 851 (namely, a conviction on September 17, 1980, in Los Angeles County Superior Court, for possession of marijuana for sale, in violation of California Health & Safety Code § 11359), was found to be true.

3.  On April 17, 1989, the Central District Court sentenced Defendant to a term of imprisonment of ten years, to be followed by eight years of supervised release, on Count One.  The Court also sentenced Defendant to a concurrent term of imprisonment of ninety-six months, to be followed by six years of supervised release, on Count Two.

4.  On June 18, 1997, Defendant was released from custody and began his eight-year term of supervised release.  Without any tolling, this term of supervised release would have ended on June 17, 2005.

5.  Defendant stopped reporting to the Probation Office, in violation of the express terms of his supervision, after his routine monthly visit on November 4, 1999, and Defendant admitted that he left the United States in November 1999.  Even assuming Defendant did not leave the United States and abscond until the last day of the month (i.e., November 30, 1999), by December 1, 1999, Defendant had served only 895 days of his 2,922-day supervised release term.

6.  Defendant's claim that he self-deported to

Belize in November 1999 is not credible.  Defendant did not intend to "self-deport" because he returned to the United States without permission by May 26, 2001 at the latest, when he was arrested in Michigan.  If Defendant had legitimately "self-deported," he would have not returned to the United States without permission.

7.  During Defendant's November 4, 1999 probation office visit, the probation officer, William Crovella II, told Defendant that if he were to self-deport, he must report to the United States embassy in Belize immediately upon arrival.  Furthermore, the probation officer instructed Defendant to have the embassy send the probation officer documentation confirming Defendant's arrival.

8.  Defendant did not follow the directions of his probation officer and failed to provide adequate information to the probation officer confirming Defendant's arrival in Belize.  The Court finds that this lack of communication shows that Defendant did not intend to permanently "self-deport," but merely wished to travel as he pleased while simultaneously misleading his probation officer into believing that he was no longer subject to supervision.

9.  Defendant argues that certain documents that were sent to the probation officer show that Defendant did self-deport.  However, the Court finds that the documents sent to the probation officer failed to fulfill the probation officer's original November 4,

4

1999 instructions to Defendant.

10. Defendant proffers a November 10, 1999 letter written by an attorney in Belize to the probation officer.  Enclosed with this letter was a document entitled "Notification of Departure."  Def.'s Ex. C. The Court finds that this "Notification of Departure" is ambiguous and does not show that Defendant followed the instructions of the probation officer.  The Notification of Departure reports Defendant's departure from the United States for Belize as June 11, 1999, and bears a signature identified as belonging to a vice-consul at the United States Embassy in Belize. Gov't's Ex. F.  The Notification also bears a handwritten note at the bottom that asserts that the date of departure was actually November 6, 1999, not June 11, 1999.  The handwritten note states that an "entry stamp" of Defendant's birth certificate show that the date of entry was actually November 6, 1999. The handwritten note implies that the date of entry referred to in the Notification has been misread as June 11, 1999 (i.e., 6/11/99) when it is really November 6, 1999 (i.e., 11/6/99).

11. However, The date on the birth certificate is July 15, 1999, which would be 7/15/99 or 15/7/99, but in no case November 6, 1999.  No explanation was offered for why the handwritten note at the bottom of the Notification should be believed instead of the information properly filled out on the form itself.

12. Defendant argues that a January 25, 2000 letter sent to the probation officer from the embassy of the United States in Belize affirmatively shows that Defendant followed the probation officer's November 4, 1999 instructions. Def.'s Ex. D. The Court finds that this letter does not support Defendant's argument. Though the letter states that Defendant had been in contact with the Embassy and states that fingerprints and birth certificates have been enclosed, no fingerprint or birth certificate were actually included with the letter. Notwithstanding, the letter was sent on January 25, 2000, more than two months after Defendant's alleged arrival in Belize. Thus, this letter did not fulfill the probation officer's instructions for confirmation upon arrival. Furthermore, without the fingerprints or birth certificate, the Court finds that this letter does not show that Defendant was actually in Belize during that time.

13. Defendant's whereabouts were unknown to the probation officer from at least December 1, 1999, through May 27, 2001, when Defendant was turned over by Michigan State Police to the United States Marshal Service in Detroit, following his arrest by the Michigan State Police for speeding.

14. Defendant reported to his probation officer on a monthly basis between July 2001 and December 2002.

15. Defendant failed to appear for his routine

monthly Probation Office visit on January 9, 2003.

16. Defendant was deported by the United States on February 5, 2003.

17. Defendant was back in the United States by at least September 4, 2003, when he was detained by agents of the Drug Enforcement Agency ("DEA") at the Long Beach Airport.  Although Defendant was released at that time, he failed to report to the probation officer by September 7, 2003, as he was required to do by the conditions of his release, or anytime thereafter.

18. On March 8, 2009, Defendant was arrested by Special Agents of the California Department of Justice, Bureau of Narcotic Enforcement ("BNE"), in Inglewood, California.  At the time, he was using the name "Allen Arnold Stewart."

19. On March 9, 2009, a federal detainer was lodged against Defendant.

20. On October 28, 2010, Defendant pleaded guilty to the state charges arising from his March 8, 2009, arrest.  On January 31, 2011, Defendant was sentenced by the California state Court to a term of four years, with credit for time served.

21. Defendant completed service of his state court sentence on March 9, 2011. On March 10, 2011, Defendant was transferred to the custody of the U.S. Marshals pursuant to the detainer.

## II. CONCLUSIONS OF LAW

1. "A defendant's term of supervised release is

tolled . . . when he is in 'fugitive status.'" United States v. Watson, 633 F.3d 929, 931 (9th Cir. 2011)(internal citation omitted).

2. A defendant is deemed to be a fugitive from his supervised release when he absconds from supervision. Watson, 633 F.3d at 931; accord United States v. Juarez, 601 F.3d 885, 890 (9th Cir. 2010).

3. "Tolling of a supervised release term extends the date the term is set to expire as long as the defendant remains a fugitive." United States v. Delamora, 451 F.3d 977, 980-81 (9th Cir. 2006).

4. Tolling ends, the term of supervision recommences, and "the clock beg[i]ns running again," when a defendant is arrested and brought back into federal custody or federal authorities become aware of his whereabouts. Id.; Watson, 633 F.3d at 932; Juarez, 601 F.3d at 890.

5. Here, Defendant was on fugitive status no later than December 1, 1999. Defendant stopped reporting to his probation officer, in violation of the express terms of his supervision, after his routine monthly visit on November 4, 1999, and Defendant admitted that he left the United States in November 1999. Even assuming Defendant did not abscond until the last day of the month (i.e., November 30, 1999), by December 1, 1999, Defendant had served only 895 days of his 2,922-day supervised release term. His term was tolled thereafter by his fugitive status.

6. Defendant's term of supervision began running again on May 27, 2001, when he was turned over by Michigan State Police to the United States Marshal Service in Detroit.

7. Defendant's term of supervision was again tolled beginning on September 7, 2003. By that date, Defendant had not contacted his probation officer, as he was required to do by the conditions of his supervised release, to report his contact with DEA agents on September 4, 2003, when he was detained at the Long Beach Airport. As of September 7, 2003, Defendant had served a total of 1,728 days of his 2,922-day supervised release term.

8. Defendant continued on fugitive status, and his term of supervision continued to be tolled, until March 9, 2009, when the federal detainer was lodged against him in Imperial County. His term of supervision began running again at that time.

9. As of May 10, 2011, Defendant had served a total of 2,520 days of his total 2,922-day supervised release term. Thus, on May 10, 2011, Defendant was still on supervised release with 402 days remaining.

10. Because Defendant's term of supervised release had not yet expired on May 10, 2011, this Court had jurisdiction to revoke his term of supervised release at the hearing on that day.

///

///

11. To the extent that a Finding of Fact herein is a Conclusion of Law, it shall be so construed. Likewise to the extent a Conclusion of Law is a Finding of Fact it shall be so construed.

**IT IS SO ORDERED.**

DATED: June 19, 2012

RONALD S.W. LEW
_____
**HONORABLE RONALD S.W. LEW**
Senior, U.S. District Court Judge